UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MCCLURGE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 19-CV-08394 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Christopher McClurge brought this action seeking review of the Social Security Commissioner's denial of his application for disability-insurance benefits and Supplemental Security Income.[1] McClurge claims that he suffers from schizophrenia, which leaves him unable to work and thus eligible for disability benefits under the Social Security Act, 42 U.S.C. § 423. R. 1, Compl.[2] McClurge contends that his schizophrenia and attendant mental health symptoms disable him from working, but the Administrative Law Judge found that his limitations were not so severe as to make it impossible for him to find work. The issue in this case is whether the judge correctly determined McClurge's residual functional capacity, which in turn determines what kinds of work are available to him in the national economy. For the reasons discussed

---

[1]This Court has subject matter jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3).

[2]Citations to the docket are noted as "R." followed by the docket entry and, when necessary, a page or paragraph number.

in this Opinion, McClurge's request to vacate the denial is granted, and this matter is remanded to the Administrative Law Judge for further consideration.

## I. Background

McClurge first applied for disability benefits in October 2016. R. 6-1, Administrative Record (AR) at 15. In the application, McClurge alleged a disability onset date of January 15, 2013. *Id.* The application was initially denied in March 2017, and denied again on reconsideration in May 2017. *Id.* at 15, 116, 123. He then requested a hearing in front of an Administrative Law Judge (commonly called an ALJ); the hearing was held in July 2018. *Id.* at 15. After the hearing, the ALJ issued an opinion finding that McClurge was not disabled because he was able to do some types of work that are available in the national economy. *Id.* at 17–28. The Social Security Administration Appeals Council denied McClurge's request for review of the ALJ's decision, rendering the ALJ's ruling the final decision of the Commissioner. *Id.* at 1–6; *see Villano v. Astrue,* 556 F.3d 558, 561–62 (7th Cir. 2009). McClurge filed his Complaint with this court in December 2019, seeking review of the ALJ's decision. *See* Compl.

### A. Factual Background

The Administrative Record supplies the factual background of this case. At the time of the ALJ hearing, McClurge was 45 years old and a high school graduate. AR at 40. In the work history that McClurge listed in his initial application for disability benefits, he reported a series of short-lived jobs in various industries, including food service, retail, and demolition, between June 1999 and October 2011. *Id.* at 240. There are several long gaps in his work history, including between January 2001 and

April 2005, and between August 2005 and September 2011. *Id.* Sometime in 2013, McClurge was imprisoned in the Illinois Department of Corrections to serve a sentence for a conviction of aggravated domestic violence. *Id.* at 378.[3] He remained incarcerated until sometime in 2016, when he was released after serving about 3½ years in custody. *Id.* at 45, 551. Before his incarceration, McClurge had been working in a warehouse as a newspaper stacker. *Id.* at 378. After his release, he worked for about one month as a warehouse laborer before being laid off. *Id.* at 551. He spent some time living at a halfway house, then with his aunt, and by the time of his hearing, he was in a rooming house. *Id.* at 18, 45.

McClurge claims that his schizophrenia prevented him from working as of January 15, 2013; it is not clear how he chose this date, and the earliest mental health records in the Administrative Record date back only to February 2014. AR at 23. At that time, he underwent a mental-health evaluation in the Illinois Department of Corrections. *Id.* at 378. The mental-health history questionnaire notes that he had previously received outpatient psychiatric treatment in 2006 and had previously taken psychotropic medication. *Id.* The screening also notes one suicide attempt in 2006. *Id.* at 379. The evaluator, Dr. Ibe, noted that McClurge was appropriately alert,

---

[3]The record is unclear on the exact dates and duration of McClurge's incarceration. During his administrative hearing, McClurge testified that he was incarcerated from 2013 to 2016. AR at 45. February 2014 is the date on the Illinois Department of Corrections Mental Health Screening, which lists him as a new admission. *Id.* at 378. But in his February 27, 2017 exam with licensed psychologist Jeffrey Karr, McClurge said he had been released from prison in 2016 after serving 3½ years. *Id.* at 551. And there is a disability report in the administrative record that says his date of first contact with Danville Correctional Center was January 2013. *Id.* at 232.

oriented, and focused, and calm, ultimately clearing him for the general population. *Id.* at 380–81. In April 2014, a social worker at Danville Correctional Center named MaKayla Bosch conducted a Mental Health Segregation Review of McClurge, who told Bosch that he was experiencing auditory and visual hallucinations and requested to be put back on medication which he had apparently received earlier at the Cook County Jail. *Id.* at 386.[4]

In May 2014, Dr. Rezwan Khan at the Danville Correctional Center conducted an Initial Evaluation of McClurge's mental health, which notes that McClurge said that he was hearing voices, feeling paranoid, and "seeing shadow[s]." AR at 387. McClurge asked Dr. Khan to prescribe him Risperdal, psychotropic medication that he had previously taken for his symptoms. *Id.* Dr. Khan diagnosed paranoid schizophrenia and alcohol dependency, and prescribed the Risperdal. *Id.* at 387, 390. About two weeks later, McClurge met again with the social worker, Bosch, and reported that he was "feeling much better" on the Risperdal. *Id.* at 394. He said the medication "really quieted down the voices." *Id.* His diagnosis of paranoid schizophrenia is recorded on the Mental Health Progress Note from this meeting. *Id.* In mid-July 2014, he saw Dr. Khan again, then Bosch again a few days later, and reported to both that he was still feeling better thanks to the medication. *Id.* at 395–96. Bosch noted that, during both of her interviews with McClurge, he exhibited limited insight, but displayed no signs of psychosis; in the second one, he also presented with poor hygiene.

---

[4]The prison's form states "c/o AH/VH," which McClurge interprets in his brief as auditory hallucinations and visual hallucinations. Pl.'s Br. at 2.

*Id.* at 394, 396. In late July, McClurge saw Bosch again, and she noted that he reported feeling good and denied currently experiencing hallucinations, but continued to display limited insight. *Id.* at 397.

In September 2014, McClurge reported to Bosch that he was "still struggling with the voices and everything, but it's better." AR at 400. He reported experiencing some anxiety and depression, as well as manageable audio and visual hallucinations. *Id.* at 398, 400. He explained that he was not taking his "morning medication," because he preferred to take all his medication at night, but the record does not specify which medication he was taking in the morning. *Id.* at 400. Bosch's report from this meeting notes that she "[r]eviewed importance of medication compliance" with McClurge and that he "voiced understanding." *Id.* Dr. Khan met with McClurge again a few days later and renewed his Risperdal prescription. *Id.* at 401. In November 2014, McClurge met again with Bosch, who noted that McClurge was still taking his medication, now at his preferred time, and did not display any signs of psychosis, though his insight remained limited. *Id.* at 402. McClurge's diagnoses remained the same throughout this time.

Just a couple of days after this positive interaction with the social worker, McClurge was placed on crisis watch after correctional staff intercepted a letter to his mother in which he told her that voices in his head were telling him that "bad things were going to happen on my birthday." AR at 403. McClurge insisted that he was not feeling suicidal and that he no longer thought anything bad would happen to him on his birthday. *Id.* A few days later, he was returned to the general population

of the prison with a note in his record that he was "med compliant" and had a "stable mood." *Id.* at 405–06. But he spent his birthday, December 22, in crisis care on suicide watch, because he stated that, although he was not suicidal, he did believe he would die that day because of what the voices had told him previously. *Id.* at 409–11. One important fact for later: at that time, McClurge was still compliant with his medication. *Id.* at 411. The day after his birthday, having come to no harm, McClurge reported feeling better. *Id.* at 413.

In March 2015, McClurge was examined again by Dr. Khan, who reminded him again of the importance of taking his medication. AR at 420. Dr. Khan also noted that McClurge had not reported any hallucinations since December 2014. *Id.* In that month (March 2015), McClurge also met with a social worker named Carol Bradford, who reported that he had a flat affect, was compliant with his medication, and had fair insight. *Id.* at 422. In July 2015, McClurge met with Bradford again, and Bradford noted that he was taking his medication and working five days a week, which helped his mood. *Id.* at 423. McClurge's diagnosis of paranoid schizophrenia remained unchanged, and records of all three examinations state that McClurge was taking his medication. *Id.* at 420–423. Examiners did record a flat affect and poor eye contact on March 25, and mild paranoia in July. *Id.* at 422, 423. In an examination in December 2015, McClurge reported his childhood experience of being sexually abused by two babysitters when he was about nine years old. *Id.* at 496. The examiner that day, J. Carlson, noted that McClurge was not reporting any current hallucinations but "acted almost over medicated." *Id.* at 500. In February 2016, another doctor at the

6

jail, Dr. Gulam Noorani, examined McClurge and continued to prescribe Risperdal. *Id.* at 501. In May, McClurge asked to discontinue the medication because of his impending release, and Dr. Noorani authorized a tapering off of that medication. *Id.* at 534. In late June, McClurge hit his cellmate in the face, and was disciplined with one month in segregated confinement. *Id.* at 537–38.

By October 2016, McClurge had been released from IDOC custody, as evidenced by his application for disability benefits. AR at 15. Records of his medical treatment since then are spotty. He participated in a clinical research study for schizophrenia at Uptown Research Institute from December 27, 2016 through July 17, 2017, through which he received Invega Sustenna injections. *Id.* at 555, 618. At his hearing with the ALJ, McClurge testified that he was taking pills for the voices, and offered to take the pills out of his bag to show the ALJ. AR at 42. He also said that he was going to a clinic where he talked to a psychiatrist once a month. *Id.* at 43. But there are no other records of this treatment in the record.

As part of his application for benefits, McClurge completed a "Function Report" assessing his own ability to work. AR at 250–60. Asked how his condition limited his ability to work, he wrote, "I still hear voices, I'm still over hyper, stress[ed] out, I'm still tra[u]matize[d] from being molested when I was 6 years old." *Id.* at 252. He wrote that he sometimes lost entire nights of sleep because of his condition, and that he struggled to keep up with his own personal hygiene and appearance. *Id.* at 253. He reported needing reminders to take his medicine. *Id.* at 254. Although he reported preparing his own meals, he listed simple meals including sandwiches and cereal,

said he only prepared food two or three times a week, and said that when he cooked, he sometimes would burn his food. *Id.* McClurge also explained that he was responsible for some simple household chores but that he needed help or encouragement to do them. *Id.* He also said that he went out every day, walking or taking the bus by himself, and that he went shopping for food and hygiene items about once a month. *Id.* at 255. As for daily activities and hobbies, McClurge reported reading (with difficulty), watching TV, going online, seeing friends, going to movies, restaurants, the beach, church, and mosque. *Id.* at 256. Communication with others was difficult, wrote McClurge, noting that written instructions were sometimes hard to follow, and following spoken instructions was "very hard sometimes." *Id.* at 257.

In February 2017, McClurge underwent an in-person consultative examination with psychologist Dr. Jeffrey Karr in connection with his application for disability benefits. AR at 549–54. Karr spent 45 minutes examining McClurge, and reviewed his mental-health notes from the Department of Corrections. *Id.* at 551. Karr's report includes a brief history of McClurge's education, incarceration, and employment history. *Id.* McClurge told Karr that he saw friends occasionally, but spent most of his time alone, including going out to movies or to eat. *Id.* He had also come to the appointment alone, taking public transportation. *Id.* Karr noted that McClurge was able to take the bus, use the computer, do some chores, and cook fish, but that his aunt did his laundry and shopping. *Id.* at 552. McClurge also reported drinking about three times a week, including sometimes alone or in the morning. *Id.* McClurge reported that he was seeing a psychiatrist twice a month and was taking two medications for

8

his schizophrenia (Seroquel, and Invega injections). *Id.* Karr noted that McClurge told him he had "been in treatment many years for alleged paranoia, auditory experiences, agitation, suicidal ideation," and had been prescribed Thorazine and Risperdal previously. *Id.* Wrote Karr: "He reports hopelessness, periodic suicidal ideation, prior agitation & further alleged ongoing periodic auditory experiences, with the last episode 2 weeks ago but unable to describe content." *Id.* Karr reported that McClurge voiced "persecutory thoughts" and had a "dysphoric" mood. *Id.* at 553. McClurge knew his own birth date and the date of the exam, and could identify prominent celebrities and large cities, but he did not know any recent news and could neither count backwards in sevens nor remember any three items. *Id.* Karr ultimately diagnosed McClurge with schizoaffective disorder and alcohol use disorder and noted that he would need help handling money. *Id.* at 554.

In reaching his decision, the ALJ relied on statements and testimony from McClurge, as well as from three experts—psychologists Thomas Low, Ph.D.; David Voss, Ph.D.; and vocational expert Leida Woodham, Certified Rehabilitation Counselor—as well as the medical records from the Illinois Department of Corrections. AR at 15, 20, 26. At his hearing, McClurge testified about a recent unsuccessful work attempt: for around three months in 2018, he worked as a laborer at Koch Foods. *Id.* at 41. He explained that he was fired from that job shortly before his hearing, because of interpersonal conflicts with his supervisors and coworkers. *Id.* at 41–42. He said he had a hard time controlling his stress and anger, and focusing on his work, in part because he was hearing voices: "the voices were telling me to get violent, you know,

*even to the point killing people*, you know … I was just having a lot of, a lot of stress and anger." *Id.* at 42 (emphasis added). McClurge told the ALJ that he was taking pills for his schizophrenia, and that if he missed a day, he would become "a lot more aggressive." *Id.* at 43. Of the pills, he said, "they slow me down. It's like they humble me and stuff." *Id.* The ALJ asked if McClurge's tough days at work were days that he had forgotten to take his pills, and McClurge said forgetting his pills "probably eventually led to getting probably in an argument or, you know, almost getting in a fight." *Id.* But he continued, "even when I take the pills, you know, even when they slow me down, you know, I still, I'm still having issues, you know, with, you know, my anger and stuff like that, you know. So, I mean that's just something, that's like an ongoing thing that I'm going to have to try to overcome." *Id.* When questioned by his own attorney, McClurge reiterated that he struggled at Koch Foods because he was always assigned to work close to others, and he could not avoid fighting and arguing. *Id.* at 48. He also explained that he was told he worked too slowly on the production line, and was told he needed to "pick up the pace" or else he would get fired, which is what ultimately happened. *Id.* at 50.

McClurge also testified about interpersonal difficulties outside of work. When asked if he had problems with other passengers on the bus or train, he said he did not. AR at 49. But he added, "the only time I had problems if, you know, if I, you know, interact with somebody on there and they, you know, come at me the wrong way and then, and then it becomes a problem, you know." *Id.* at 49–50. When asked if he ever got into fights in other public places, McClurge replied, "Yeah. It definitely,

that definitely happens a lot, you know.… I'm always running into people that I just don't see eye to eye with, you know." *Id.* at 50.

The psychological experts whose reports the ALJ reviewed reached similar conclusions about McClurge's condition and limitations, but with a few key differences. Without examining McClurge personally, Dr. Thomas Low completed his report in March 2017, relying on records from Karr, the Uptown Medical Center, and the IDOC. AR at 77–87. Dr. Low noted McClurge's limitations in concentration and persistence, and social interactions, and opined that McClurge's own statements about his symptoms and their limiting effects on his life were substantiated by the objective medical evidence. *Id.* at 83. Low summarized his assessment of McClurge's work capacity like this: "Claimant has some cognitive limitations and would have difficulty following and recalling complex directions and work routines. He can still focus well enough to follow simple 1[ ]and 2 step directions. He has social impairments but could work in settings with reduced contact with the public and supervisors." *Id.* at 85.

Dr. David Voss completed a second evaluation in May 2017, as part of the reconsideration process. AR at 88–99. He largely affirmed Low's determination, with some modifications. *Id.* at 94. Dr. Voss felt that McClurge's statements about his symptoms and limitations were not fully supported by the medical evidence. *Id.* at 95. Dr. Voss also abandoned, without comment, the "1 and 2 step directions" limitation recommended by Dr. Low, stating that McClurge could "maintain the concentration and persistence necessary to carry out simple tasks in a reasonably punctual fashion and consistent pace in a typical work environment." *Id.* at 96. Slightly more

11

specifically, "he retains the mental capacity for work related activities that involve simple instructions and routine/repetitive tasks." *Id.* at 97. Dr. Voss also found that McClurge "could work in settings with reduced contact with the public and supervisors." *Id.*

The vocational expert, Leida Woodham, also testified at the hearing. AR at 52. The ALJ asked Woodham what work, if any, would be available to someone of McClurge's age and education, with no relevant work history, who could remember and follow simple instructions, "complete routine tasks," "make simple work-related decisions," "adapt to occasional changes" at work, and "interact occasionally with coworkers and supervisors," but who could not engage in teamwork or interact with the public. *Id.* at 52–53. Woodham replied that three representative types of jobs would be available to such a worker: kitchen helper, meat trimmer, and hand packager. *Id.* at 53. Woodham also confirmed that those jobs would still be available to a worker who could not meet a production-rate pace. *Id.* at 53.

## B. The Disability Determination Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The test requires the Commissioner to consider: (1) whether the claimant has performed any substantially

12

gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether he is able to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

If the answer to Steps 1 or 2 is "no"—that is, the claimant performed substantially gainful activity or lacks a severe impairment—then the Commissioner will reach a finding of "not disabled." *See Zurawski*, 245 F.3d at 886. Otherwise, the Commissioner moves on to Step 3. If Step 3 is answered in the affirmative, and the claimant's impairment is listed as one that precludes substantial gainful activity *per se*, then the claimant is found to be disabled. *Id.* If not, then the Commissioner must determine the claimant's residual functional capacity—that is, the sort of work that the claimant can still perform given his impairment(s)—and assess whether that capacity allows the claimant to perform either his past work (Step 4) or any other work existing in significant numbers in the national economy (Step 5). *Id.* If it does not, then the claimant is disabled. *Id.* The claimant bears the burden of proof at Steps 1 through 4. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. After that, it is up

to the Commissioner to establish that the claimant is capable of performing work that exists in significant numbers in the national economy. *Zurawski*, 245 F.3d at 886.

### C. The ALJ's Decision

The ALJ walked through the five-step process. At Step 1, he found that McClurge had not engaged in substantial gainful activity since his alleged disability onset date of January 15, 2013. AR at 17–18. At Step 2, he found that McClurge had a severe impairment in the form of schizophrenia, as well as non-severe impairments of alcohol use disorder and obesity. *Id.* at 18–19.[5] At Step 3, the ALJ determined that McClurge's impairment was not severe enough to match with an impairment listed in the regulations as precluding any possible gainful activity. *Id.* at 19–22.

At Step 4, the ALJ determined McClurge's residual functional capacity, essentially his ability to do work in spite of his schizophrenia. The ALJ found that McClurge could do work at all exertional levels, but with important limitations:

> He can understand, remember, and carry out simple work instructions and can complete routine tasks. He can make simple, work-related decisions. He can adapt to occasional changes in the work setting. He can interact occasionally with coworkers and supervisors performing job duties that do not involve tandem tasks or teamwork. He should not have to interact with the public.

AR at 22. To arrive at this assessment, the ALJ first asked whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce McClurge's symptoms, finding that there was. *Id.* at 23.

---

[5] Since neither of these non-severe impairments is important to the core dispute in this case, the Court has not discussed McClurge's alcohol use history or weight in detail.

Next, the ALJ looked at the intensity, persistence, and limiting effects of the symptoms, and their effect on McClurge's capacity to work. *Id.* In this analysis, the ALJ expressed his opinion that McClurge's statements about his limitations were "not entirely consistent" with the rest of the record, echoing Dr. Voss's earlier assessment. *Id.* He acknowledged that McClurge sometimes heard voices, but also found it significant that even without consistent mental health treatment, McClurge had "generally been able to function independently in his activities of daily living." *Id.* He explained that the residual functional capacity determination accounted for McClurge's difficulties with coworkers by protecting him from teamwork-heavy jobs. *Id.* The ALJ's analysis at Step 4 will be discussed in more detail below, because it is the source of McClurge's chief complaint.

Based on the residual functional capacity he had assigned to McClurge, the ALJ found that work was available for McClurge to do. AR at 27–28. Remember that at this stage, the burden of proof shifts to the government to establish that there were significant numbers of jobs in the national economy that McClurge would be able to do. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. Relying on the testimony of the vocational expert, Woodham, the ALJ determined that even with his limitations, McClurge would be able to work in unskilled occupations at the medium exertional level, including kitchen helper (DOT 318.687-010), meat trimmer (DOT 525.684-053); and hand packager (DOT 920.587-018), which together accounted for around 350,000 jobs in the national economy. *Id.* at 28. As a result, the ALJ concluded

that McClurge was not disabled and had not been disabled since January 15, 2013. *Id.*

## II. Legal Standard

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). The Appeals Council's decision to not review an Administrative Law Judge's ruling constitutes a final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009). A decision must be reversed if the Commissioner committed an error of law or if the record as a whole does not contain substantial evidence to support the Commissioner's findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). If there is an error of law, reversal is warranted, regardless of how much evidence supports the final determination. *Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir. 1980). A decision contains an error of law when it fails to comply with the Commissioner's regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (reversing decision that did not comply with regulation concerning weight given to treating physician).

Although this Court reviews the ALJ's legal decisions *de novo*, the ALJ's factual determinations are granted deference and affirmed so long as they are supported by substantial evidence on the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Evidence is substantial if a reasonable person would accept it as adequate to support the ALJ's decision. *Id.* "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

16

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors his ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634–35 (7th Cir. 2007); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence." (collecting cases)). Although the ALJ is not required to discuss every piece of evidence in the record, he must provide in his decision "a logical bridge between the evidence and the conclusions so that [the Court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones,* 623 F.3d at 1160 (cleaned up).[6] "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## III. Analysis

McClurge challenges the ALJ's determination of his residual functional capacity to work, and the resulting determination of what jobs are available to him in the national economy. R. 13, Pl.'s Br. The Commissioner, meanwhile, requests that the final decision be affirmed, insisting that it rests on substantial evidence in the administrative record. R. 24, Def.'s Br. Not all of McClurge's arguments are equally sound, but he points out several crucial flaws in the ALJ's opinion: the failure to

---

[6]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

adequately account for McClurge's limited ability to follow instructions; the failure to adequately account for McClurge's interpersonal struggles, particularly as caused or exacerbated by his auditory hallucinations; and the interpretation of McClurge's ability to carry out daily living activities. *See* Pl.'s Br. Because of these three problems, a remand is required, as explained next.

## A. Limitations on Ability to Follow Instructions

The ALJ reviewed reports from two different agency psychologists, Dr. Low and Dr. Voss, who provided two different opinions on the level of complexity that McClurge could handle in his work tasks. AR at 26. Both found that McClurge had a moderate limitation in his ability to understand, accept, and follow instructions, and respond appropriately to supervisors' criticisms. *Id.* Dr. Low opined that McClurge could only be expected to follow instructions for very simple, one-and-two step tasks. *Id.* at 85. Dr. Voss, who provided his report at the reconsideration stage, offered an evaluation with somewhat of a lesser limitation, finding that McClurge retained the "mental capacity for work related activities that involve simple instructions and routine/repetitive tasks." *Id.* at 97. The ALJ adopted Dr. Voss's opinion on McClurge's abilities, without expressly explaining why the ALJ was rejecting Dr. Low's one-and-two-step limitation. *Id.* at 22, 26. Instead, the ALJ discussed the two doctors' opinions of McClurge's limitations in the same paragraph, not acknowledging the difference in their evaluations of the types of instructions that would be appropriate for McClurge. *Id.* at 26. McClurge argues that the ALJ did not adequately account for McClurge's limitations in following instructions. Pl.'s Br. at 5. By omitting the one-

18

and-two-step task limitation, the ALJ paved the way for the alleged next error, of finding that McClurge had the capacity to do more jobs than are really suitable for him. *Id.* at 8–9.

It matters that the ALJ did not explicitly address his reasons for rejecting the one-and-two-step task limitation, because this rejection was extremely consequential. McClurge points out that under agency regulations, Dr. Low's opinion—with the one-to-two-step limitation—only qualified McClurge for jobs at Reasoning Level One, which requires workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions." Dictionary of Occupational Titles, Appendix C, 1991 WL 688702. But without that limitation, relying instead on Dr. Voss's evaluation, McClurge was also qualified for jobs at Reasoning Level Two, at which workers can "carry out detailed but uninvolved written or oral instructions." *Id.* Woodham, the vocational expert, testified about three types of jobs for which McClurge was qualified, under the limitations presented by the ALJ. AR 53. Of those three types of jobs, only one, "meat trimmer," is considered suitable for workers operating at Reasoning Level One. *See* 525.684-054, Trimmer, Meat, Dictionary of Occupational Titles (DICOT), 1991 WL 674428.[7] So if the ALJ had accepted Dr. Low's evaluation of McClurge's work capacity, the number of jobs available to him in the national economy would have been drastically reduced, possibly leading to a different outcome in his disability determination.

---

[7]The other two jobs are both at Reasoning Level Two. *See* 318.687-010 Kitchen Helper, DICOT, 1991 WL 672755; 920.587-018 Packager, Hand, DICOT, 1991 WL 687916.

Crucially, neither the ALJ nor Dr. Voss explicitly addressed the one-to-two-step limitation proposed by Dr. Low. It is true, as the government points out, that the ALJ explained that on the subject of McClurge's ability to understand, remember, or apply information, he accepted Dr. Voss's evaluation that McClurge had a mild limitation, as opposed to Dr. Low's evaluation that it was a moderate limitation, because the ALJ felt the record better supported Dr. Voss's opinion. AR at 20. The Commissioner suggests that this analysis must have encompassed the one-to-two-step instructions limitation. Def's. Br. at 9–10 (citing AR at 25). But the issue is too important to be addressed by implication, and the Court cannot consider an explanation for the ALJ's decision that is being newly offered by the government in litigation. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). If Voss, who had access to Dr. Low's report, had explicitly rejected Dr. Low's finding about the limitation, and also explained why he did so, then the Commissioner would have a stronger argument—there might then be a "logical bridge" between the record and the ALJ's decision. But the ALJ's opinion does not build that bridge.

Because the stakes are so high on the one-to-two-step instructions issue, the ALJ's failure to address it, on its own, warrants a remand. But two more aspects of the ALJ's opinion were also insufficiently grounded in the record, and further necessitate the remand.

## B. Hallucinations and Ability to Interact

McClurge also argues that the ALJ did not adequately consider the severe auditory hallucinations that McClurge experiences. Pl.'s Br. at 9. The Commissioner

contends that the ALJ considered the effectiveness of medication in controlling McClurge's symptoms, and appropriately relied on record evidence that found that his hallucinations were infrequent. Def.'s Br. at 4–5. The Commissioner cites the ALJ's conclusion that based on the record, McClurge had only "sporadic" hallucinations and "had little difficulty with concentration." *Id.* at 10 (citing AR at 21). Ultimately, says the Commissioner, McClurge's "arguments boil down to a plea to reweigh the evidence in his favor," which is, of course, not allowed. Def.'s Br. at 4.

Even more fundamentally, McClurge contends that the ALJ did not have a substantial basis for deciding that McClurge could interact occasionally with supervisors and colleagues, but not with the public, despite his acknowledged "moderate limitations" in interacting with others (which are related to his mental-health challenges). Pl.'s Br. at 4–5. The Commissioner counters that "moderate limitations" are not an absolute bar to interpersonal interaction, and that the ALJ's decision was substantially supported by the record, in particular by the opinions of Drs. Low and Voss, who both said that McClurge could interact with coworkers and supervisors. Def.'s Br. at 9. In effect, the question is whether the ALJ appropriately evaluated the record evidence on the intensity and persistence of McClurge's symptoms—especially his hallucinations—and how they affect his ability to work with other people.

When evaluating the intensity and persistence of the claimant's symptoms, the ALJ may not base his determination "solely on objective medical evidence unless that ... evidence supports a finding that the individual is disabled." SSR 16–3p, 2017 WL 5180304, at *4 (Oct. 25, 2017). The ALJ must also examine the claimant's

statements and "evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. Importantly, the Judge must "*explain* which of an individual's symptoms [he] found consistent or inconsistent with the evidence in [an individual's] record and how [the Judge's] evaluation of the individual's symptoms led to [his] conclusions." *Id.* at 8 (emphasis added). If the claimant's statements on his or her symptoms are consistent with the objective medical evidence, then it is more likely that symptoms will be found to reduce the claimant's capacity to work. *Id.*

Here, the ALJ failed to grapple with how McClurge's symptoms—his auditory hallucinations, in particular—affected his working experiences and ability to work in the future, and he did not adequately address McClurge's own statements about his symptoms. The ALJ noted that "the claimant reported difficulty in constantly interacting with coworkers in a recent unsuccessful work attempt," but asserted that by limiting him to occasional interactions with coworkers, the residual functional capacity determination addressed this issue. AR at 23, 25. But the ALJ did not acknowledge, in his analysis of McClurge's problems interacting with his coworkers, an important source of those problems: the voices in McClurge's head. According to McClurge's testimony, the voices in his head told McClurge—*while he was at work*— "to get violent, you know, even to the point [of] killing people, you know …." AR at 42. This is a striking piece of testimony to ignore. The testimony about those hallucinations weighs in favor of finding McClurge disabled, and "[a]n ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion." *Smith v.*

*Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). If the ALJ disregarded or downplayed McClurge's direct testimony about the voices he heard at his job because of concerns about his credibility, the ALJ needed to say so directly. "When an individual's symptoms and related limitations are found to be inconsistent with the evidence in the record, the ALJ must explain which of an individual's symptoms she found consistent or inconsistent with the evidence and how her evaluation of the individual's symptoms led to her conclusion." *Dejohnette v.* Berryhill, 2018 WL 521589 at *5 (N.D. Ill. Jan. 22, 2018) (citing SSR 16-3p). The ALJ merely made a blanket statement that McClurge's testimony about his symptoms was "not entirely consistent with the medical evidence and other evidence in the record." AR at 23. This "boilerplate credibility assessment" does not give the Court any insight into why the ALJ specifically rejected McClurge's testimony about his hallucinations and their impact on his daily life. *Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011).

At times, the ALJ appears to lean heavily on evidence suggesting that McClurge's hallucinations are not as severe or frequent as he claims, even when such evidence is contradicted by other evidence in the record. For example, the ALJ cites the December 2015 IDOC mental-health evaluation, which noted that McClurge said that his last hallucination had occurred two years ago, that he only got them "every blue moon," and that he was able to ignore the voices. AR at 24–25. Elsewhere in the record it is clear that in fact, in November 2014, McClurge reported experiencing a terrifying auditory hallucination heralding his impending death. *Id.* at 409–11, 413. At the time he had this hallucination, he was on medication. *Id.* at 409, 413. And in

23

McClurge's application for disability benefits in 2016, he reported, "I still hear voices." *Id.* at 252. Although the ALJ acknowledges these record facts, he does not engage with them in his determination about what level of social interaction McClurge can have at work. *Id.* at 26. Considering McClurge's testimony at the hearing about having recently lost a job in part due to problems caused by voices in his head urging violence, the ALJ needed to engage with all of these facts in a much more serious manner, and build the required "logical bridge" from each piece of evidence to his conclusion. Although it is of course a good thing that McClurge apparently has not acted on the voices' instructions—beyond getting into verbal conflicts at work, which is troubling enough—it is risky to tempt fate by sending someone back to work knowing that he has voices in his head telling him to act violently.[8] Even if hallucinations happen infrequently, as the ALJ thought, the *nature* of the hallucinations—instructing McClurge to *kill* people—must be taken into account.

McClurge makes a related argument that the ALJ did not explain how he decided that McClurge could have contact with coworkers and supervisors, but not with members of the public. Pl.'s Br. at 4. Nor did the ALJ explain what types of interactions McClurge could have at work. *Id.* at 6. These are fair points insofar as they relate to the difficulties that McClurge's schizophrenia and other mental-health

---

[8]Practically speaking, many employers would find it difficult to hire McClurge on the record in this case. Any prospective employer who reads the filings (although in a Social Security case, the employer would have to visit the Courthouse to do so) would see for themselves that McClurge testified about hearing voices at work telling him to kill people, and the employer would see no specific finding in the record that this testimony was not credible.

issues cause in his interpersonal relations. The ALJ found that McClurge could "interact occasionally with coworkers and supervisors performing job duties that do not involve tandem tasks or teamwork; he should not have to interact with the public." AR at 26. McClurge points out that under the regulations, "occasional" interaction can include up to one-third of the working day. Pl.'s Br. at 5 (citing SSR 83-10). Most people would consider interacting with others for one-third of the day—that is, two hours and 40 minutes out of an eight-hour shift—to be quite a lot of social interaction during the course of a single workday. The ALJ's opinion does not acknowledge the one-third definition of "occasional" or provide an evidentiary basis for his determination that occasional interaction is appropriate for McClurge. Nor did Dr. Voss, whose opinion the ALJ gave so much weight, specifically explain how McClurge's "social impairments" could still permit him to interact with others for so much of his day. AR at 96–97. It bears reiterating that McClurge's difficulties interacting with others allegedly stem in part from his need to ignore the voices in his head telling him to kill them.

On remand, the ALJ must explain in detail how and why he decided that McClurge can go to work with colleagues and supervisors, interacting with them for up to one-third of his shift, despite his symptoms, especially his consistent and troubling allegations of auditory hallucinations.

### C. Daily Living Activities

Next, McClurge argues that the ALJ mistakenly concluded that McClurge functions independently in daily life in a way that supports finding him able to work.

Pl.'s Br. at 12–13. McClurge asserts that first, he needs help in many of his daily living activities, and second, those activities differ in significant ways from what he would have to do at a job. *Id.* The Commissioner points out that the ALJ relied on record evidence that McClurge is able to go out by himself, including on public transit, and do things like see friends, shop, and go to church or the movies. Def.'s Br. at 4–5. But both of McClurge's objections to the ALJ's treatment of his daily activities are well taken.

First, the ALJ's analysis did not acknowledge the record evidence that McClurge actually struggles with many daily activities. The residual functional capacity analysis notes that McClurge "has generally been able to function independently in his activities of daily living," and that "even without regular conservative treatment, he can perform many activities of daily living independently." AR at 23, 26. The ALJ acknowledges earlier in the opinion that McClurge has said that "he needs help/encouragement" to perform simple household chores, and that "he needs someone to accompany him" when he goes out. *Id.* at 22–23. But he does not acknowledge these limitations when opining that McClurge can generally function independently. *Id.* at 23, 26. This was an error: "An ALJ cannot disregard a claimant's limitations in performing household activities." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Even more troubling, nowhere in the ALJ's opinion does he acknowledge McClurge's testimony at the hearing that he frequently has conflicts with strangers in public, because he says he is "always running into people that I don't see eye to eye with." *Id.* at 49–50. This suggests that even in low-contact, low-stakes public settings,

26

McClurge struggles to interact appropriately with others. If the ALJ had some reason for discrediting this testimony about McClurge's conflicts in his daily life, it is absent from the opinion.

That leads to the next point, which is that McClurge's daily activities are markedly different from the activities he would be expected to perform at work. The Commissioner says that the experts have opined that McClurge should not have trouble accepting instructions from supervisors, but makes no effort to explain how this will help McClurge get along with his coworkers. Def.'s Br. at 7–8. There is no real need for McClurge to interact substantially with strangers on a bus, or at the movies, or when he is out with his friends. At work, on the other hand, he will be expected to interact with coworkers for hours during a workday—a much different demand on his social skills than swiping a bus card or paying for a movie ticket. An ALJ may consider a claimant's ability to engage in daily activities in reaching his determination, but he must not lose sight of important differences between those activities, and the ones that would be expected at work. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (in a case based on physical disability, ALJ erroneously "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week.").

On remand, the ALJ must explain more fully how McClurge's abilities in daily life translate to his ability to work. This cuts two ways. On the one hand, the ALJ should explain how McClurge's limited successes and independence in the very

27

different contexts of his personal life will translate to success at work. On the other hand, the ALJ should explain why McClurge's testimony about getting into frequent conflicts in public does not raise more concern about his ability to succeed at work.

### D. Issues the ALJ Need Not Clarify

Not all of McClurge's arguments are meritorious, and the ALJ need not address every single one. The following arguments from McClurge do not require attention on remand.

**Failure to account for slow pace of work.** Pl.'s Br. at 6. The Court agrees with the Commissioner that the ALJ adequately addressed the limitations created by McClurge's slow working pace. Def.'s Br. at 10–11; AR at 26. Most importantly, the ALJ asked the vocational expert if a worker with difficulty maintaining production pace would still be able to perform the types of jobs the vocational expert had testified would be appropriate for a worker of McClurge's residual functional capacity. AR at 53. The vocational expert affirmed that he would. *Id.* So the ALJ appears to have adequately accounted for McClurge's slowness at work. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620–21 (7th Cir. 2010).

**Discussion of treatment gaps.** Pl.'s Br. at 10. McClurge says that the ALJ noted that his symptoms are worse when he is not on medication, and that this ignores the challenges people with mental illness face in keeping up with their treatment. *Id.* He also says the ALJ notes that McClurge did not consistently seek treatment after his release from prison, and that the ALJ was not allowed to "draw a negative inference regarding a claimant's subjective allegations based on her

28

noncompliance with treatment without first obtaining from the claimant any expla-
nation that she may have for her treatment decisions." *Id.* at 12. Correct as that legal
principle is, the ALJ did *not* cite noncompliance with medication, or lapses in seeking
treatment as factors in his decision about McClurge's residual functional capacity, so
there is no need to address this issue. Indeed. as the Commissioner points out, the
ALJ opined that McClurge is able to control his symptoms relatively well even when
he is *not* medicated or in treatment. Def.'s Br. at 4, 6.

      **Excessively high standard of evidence.** McClurge contends that the ALJ
applied an excessively high standard of evidence to his claims. Pl.'s Br. at 10–11. The
ALJ opined that McClurge's allegations about his symptoms and limitations were
"not entirely consistent with the medical evidence and other evidence in the record."
AR at 23. McClurge says this shows that the ALJ was applying a "clear and convinc-
ing" evidence standard, instead of the correct "preponderance of the evidence" stand-
ard for determining McClurge's disability. Pl.'s Br. at 10. If this were correct, then it
would be an error of law contradicting the Social Security Association's regulations,
and thus warranting reversal. *Moss*, 555 F.3d at 561. But McClurge is mistaken. The
ALJ used a standard turn of phrase to express his skepticism of some of McClurge's
claims. In context, across his opinion, the ALJ attempted to apply the appropriate
standard, so the boilerplate on its own is not fatal. *See Filus v. Astrue*, 694 F.3d 863,
868 (7th Cir. 2012) ("If the ALJ has otherwise explained his conclusion adequately,
the inclusion of [boilerplate] language can be harmless."). The problems with the

ALJ's opinion (and indeed, with that choice of phrasing) are those already discussed, of failing to address all the evidence that he needed to address.

### E. Request for Award of Benefits

McClurge requested that this case be remanded for an immediate award of benefits, or in the alternative, for further proceedings. Pl.'s Br. at 15. "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005). In this case, the ALJ cited to a significant amount of record evidence, but his decision was ultimately not supported by substantial evidence because he failed to address several vital issues, and failed to build the required logical bridge from the evidence to his conclusions. This is not a case where the record demonstrates beyond contradiction that the claimant is disabled, such that an instruction from the Court to award benefits would be appropriate. *See Micus v. Bowen,* 979 F.2d 602, 608–09 (7th Cir. 1992) (remanding for award of benefits where ALJ wrongfully ignored uncontested medical opinion of claimant's treating physician). On remand, the ALJ might be able to fix the deficiencies in his original opinion in a way that still leads him to deny McClurge's benefits.

## IV. Conclusion

For the reasons discussed above, the Commissioner's decision is vacated and the case is remanded for further proceedings consistent with this Opinion.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 28, 2021